[No. 24271. Department Two. September 5, 1933.]

EMILIE BECKMANN *et al., Appellants,* v. JOHN WARD *et al., Respondents,* RAYMOND E. HIGGS *et al., Defendants.*[1]

*Joseph Matsen, Lloyd R. Savage, E. W. Klein, Mifflin & Mifflin, Burkheimer & Burkheimer, Byers & Byers, Alfred J. Westberg, Edwin H. Flick, Herald A. O'Neill, Alex Stewart,* and *Peter Balkema,* for appellants.

*Padden & Moriarty, Earl F. Requa,* and *Melvin T. Swanson,* for respondents.

TOLMAN, J.—Appellants, as plaintiffs, brought this action to foreclose a real estate mortgage which had

[1]Reported in 24 P. (2d) 1091.

been given to Osner & Mehlhorn, Inc., they being the owners of certain of the notes described in and secured by the mortgage. From a decree awarding a judgment against defendant Higgs only, denying foreclosure and directing that the mortgage under which they claim be cancelled of record, the plaintiffs have appealed.

The record is voluminous and the transactions shown are considerably involved, but the controlling facts are practically undisputed, and will be stated here in greatly abbreviated form sufficiently only to present fairly what we consider the vital issue to be.

The real estate involved is a lot in the city of Seattle, improved by a frame apartment house building, the title to which on and prior to August 30, 1924, rested in Osner & Mehlhorn, Inc. On that day, for its own purposes, and using defendant Higgs as a figurehead only, Osner & Mehlhorn, Inc., conveyed the property by deed to Higgs, who, on the same day, executed the mortgage in question to Osner & Mehlhorn, Inc., as mortgagee, to secure the payment of eighteen notes aggregating the principal sum of fifteen thousand dollars, the mortgage so specifying. This mortgage was duly recorded. Immediately thereafter, Higgs deeded the property, subject to the mortgage, to August Mehlhorn, Jr. It is apparent that Higgs at no time invested any money in the property, or had, or claimed to have, any personal interest therein, but that he acted at all times for the accommodation of Osner & Mehlhorn, Inc., or August Mehlhorn, Jr., its managing officer, and probably was paid a small fee for his services in that respect.

Of the notes executed by Higgs and secured by the mortgage, $5,500 in principal amount have been paid and retired, the remainder, aggregating $9,500 in principal amount, have passed, each for a valuable consideration, to some one or other of the appellants,

and the appellants as a group now own all of the unpaid notes secured by the Higgs mortgage. No assignment of the mortgage or any interest therein was ever made by Osner & Mehlhorn, Inc., to the appellants or either of them, and, they at all times knowing that the mortgage ran to Osner & Mehlhorn, Inc., as mortgagee, no one of them made an attempt to establish his interest in the mortgage of record in any way whatsoever. Interest on their several notes was paid to them regularly by Osner & Mehlhorn, Inc., until May 30, 1930, but no part of the principal upon these notes was ever paid.

In January, 1925, August Mehlhorn, Jr., and wife, by warranty deed, conveyed the property to one Grimsley, the deed reciting that it was subject to the Higgs mortgage. A few months later, the defendant John Ward, then a bachelor, began to negotiate for the purchase of the property. In these negotiations, Grimsley, the then owner, was represented by an agent who had desk room in the office of Osner & Mehlhorn, Inc. Grimsley asked $30,000 for the property, and Ward finally offered $27,500, and at this point August Mehlhorn, Jr., was advised of the situation, and after conferring with him, all agreeing, it was arranged that Ward should pay down $8,500 in cash which he had, should give a mortgage to Osner & Mehlhorn, Inc., for $19,000, and that Osner & Mehlhorn, Inc., would advance to Grimsley an additional $4,500 to pay out his interest, and the remainder of the proceeds of the $19,000 mortgage would be used by it to satisfy the Higgs mortgage. An abstract of title was furnished to Ward, who had it examined by an attorney, and he was advised that the title was in Grimsley, free and clear of all encumbrances except the Higgs mortgage.

Following that, the arrangement was carried out,

Grimsley and wife conveying, by warranty deed, the property to Ward, the deed reciting, "subject to a balance of $14,500 of an original mortgage made August 30th, 1924, recorded in Vol. 906 of Mortgages, Page 239, Records of King County, Washington." The mortgage made by Ward to Osner & Mehlhorn, Inc., was made to secure the payment of twenty-one notes aggregating the principal sum of $19,000, which mortgage was also duly recorded. Both the deed from Grimsley to Ward and the Ward mortgage were filed for record at the request of Osner & Mehlhorn, Inc.

At the time of closing the transaction, the Higgs mortgage was not released of record, but Mehlhorn gave to Ward a receipt which reads as follows:

"Seattle, Wn., June 4, 1925,

"Received of John Ward, Fourteen Thousand Five Hundred and 00/100 Dollars in pay't of balance of mortgage made by Raymond E. Higgs on Lot 7, Blk. 84, Terry's II Addition, recorded in Vol. 906 of Mtgs., page 239 Records of King County and guarantee satisfaction of same.     OSNER & MEHLHORN, INC.,
"$14,500.                    By August Mehlhorn, Jr."

Ward was apparently satisfied with this receipt and did not afterwards demand or receive a formal satisfaction of the Higgs mortgage, nor was such a satisfaction ever executed, nor was any satisfaction of the Higgs mortgage ever made of record. Appellants here, the holders of the Higgs notes, had no personal knowledge of these transactions.

Ward proceeded in due course to pay off the notes secured by his mortgage to Osner & Mehlhorn, Inc., until he had reduced the principal to $13,000. In July, 1930, Ward and wife executed a mortgage in the sum of $15,000 on the property to Neil Ward, a relative, who made no inquiry as to the Higgs mortgage, which was still unsatisfied of record. The money borrowed

from Neil Ward was used by John Ward to pay off the remainder of the $19,000 mortgage running to Osner & Mehlhorn, Inc. All of the notes described in and secured by that mortgage were cancelled and returned to him except one, which was not returned, although several requests were made for it. Ward received a satisfaction of the $19,000 mortgage, which was placed of record, but apparently did not then make any demand for a release of the Higgs mortgage, continuing to rely upon the receipt given him at the time he purchased. These conditions continued until the disappearance of August Mehlhorn, Jr., in September, 1930, and the appointment of a receiver for Osner & Mehlhorn, Inc. Shortly thereafter, this action was commenced.

Of course, Osner & Mehlhorn, Inc., paid nothing to the appellants, the holders of the Higgs notes, at any time, save only the semi-annual interest as it became due. Osner & Mehlhorn, Inc., received sufficient money, soon after Ward executed to it the $19,000 mortgage, by selling Ward's notes, to have satisfied the plaintiff's claims, and also received in cash more than enough for that purpose when the $19,000 mortgage was paid off by Ward, but while Osner & Mehlhorn, Inc., on its books, made entries indicating such payments to the several appellants, it never, in fact, distributed the money, but kept it for its own use.

All of these Higgs notes became due by their terms on or before August 20, 1927, but the holders appear to have been satisfied by Mehlhorn's representations that their rights were not imperiled, and they did nothing to enforce payment or to secure a renewal of the notes or the mortgage; and, of course, they at no time gave any notice to the defendants Ward that these notes were outstanding and that they were the holders of them.

The trial court found:

"That the plaintiffs have possession of the notes herein sued upon and have not received from Osner & Mehlhorn Inc., any payments which were designated as principal payments on the Higgs note. That none of the plaintiffs asked for or received from Osner & Mehlhorn, Inc., partial assignments or otherwise, of the Higgs mortgage to themselves, and that they did not at any time have in their possession any assignment of an undivided interest, or of any interest in said mortgage, and that said mortgage remained in the name of Osner & Mehlhorn, Inc., during the entire time without any assignment ever having been made to any of the plaintiffs or anyone else."

In addition, the trial court made a number of special findings to the effect that the appellants, or most of them, allowed Osner & Mehlhorn, Inc., to collect for them principal and interest and to maintain a running account with them over a long period of years, and other facts, indicating that Osner & Mehlhorn, Inc., was duly authorized as the agent of the several appellants to collect both principal and interest at all times. But the conclusion we have reached renders it unnecessary to determine whether in all instances, and as to each appellant, there was a general agency, with full power to collect both principal and interest.

We pass at once to what we consider the controlling question in the case.

▮ When Ward purchased, he knew of the outstanding Higgs mortgage, and knew, constructively at least, that it secured the payment of a number of promissory notes which were presumably negotiable in form. The record disclosed the identity of the mortgagee, and disclosed no assignment of the mortgagee's interest, either in whole or in part.

Must one, under such circumstances, go beyond and behind the record and demand the production and can-

cellation of the notes secured by the mortgage, even though they are not his notes and he has no interest in them as promises to pay? Or may he rely on the record and upon the mortgagee's guaranty to satisfy the mortgage of record, as Ward did in this case?

Rem. Rev. Stat., § 10596-1, subdiv. 3, provides:

"The term 'conveyance' includes every written instrument by which any estate or interest in real property is created, transferred, mortgaged or assigned or by which the title to any real property may be affected, . . ."

Rem. Rev. Stat., § 10596-2, immediately following, and using the word "conveyance" as thus defined, provides:

"A conveyance of real property, when acknowledged by the person executing the same (the acknowledgment being certified as required by law), may be recorded in the office of the recording officer of the county where the property is situated. Every such conveyance not so recorded is void as against any subsequent purchaser or mortgagee in good faith and for a valuable consideration from the same vendor, his heirs or devisees, of the same real property or any portion thereof whose conveyance is first duly recorded. An instrument is deemed recorded the minute it is filed for record."

Rem. Rev. Stat., § 10614, makes it the duty of a mortgagee to satisfy a mortgage of record on request when paid, and § 10615, following, provides a penalty for the failure to perform that duty.

These statutory provisions are presumed to be known by all, the appellants as well as Ward, and under them we think it is here our duty to apply the rule as to comparative innocence.

True, Ward might have demanded that the cancelled notes secured by the Higgs mortgage be exhibited to him, but for him to have done so would have been quite

unusual. They were not his notes. He had no right to the possession of them, and, relying upon the record, he had no reason to assume that anyone would purchase the notes without taking and recording an assignment of the mortgage which secured them.

Perhaps Ward was somewhat negligent in accepting the mortgagee's written guaranty to satisfy the record instead of seeing to it that the satisfaction was duly made of record, but we cannot assume that his negligence in that respect caused the loss. Had Ward demanded and obtained a satisfaction of record, the appellants, judging from the whole history of the case, would have known nothing of it, and would have continued in the blind belief that Mehlhorn would protect their interest. If forced to do so, or if necessary to carry out his purposes, without a doubt, Mehlhorn would have satisfied the record in order to obtain Ward's notes, secured by the Ward mortgage, greater in amount than the outstanding Higgs notes, and would have trusted to the good luck which had lasted him so long, and to the blind confidence in him so long exhibited by the holders of the Higgs notes, that they would remain in ignorance of the fact of the release of the mortgage, or, at least, of its effect upon them.

Upon the other hand, the appellants, by purchasing and paying full face value for the mortgage notes, leaving in the hands of the man from whom they purchased full and complete legal power to assign the mortgage to others, or to satisfy it without giving them notice or asking for their consent, were negligent to an extent which might be characterized as gross. They trusted Mehlhorn to the full extent of their investment without a written line or even an oral promise other than an implied one.

Before Ward entered the scene, perhaps even before he knew of the existence of such a property, these ap-

pellants, by their own acts, had clothed Mehlhorn with complete apparent and legal authority to deal with Ward, or any other, just as Mehlhorn did deal in this case. A more complete placing of one's rights under the exclusive control of another can hardly be imagined. Had the appellants used ordinary and reasonable care in taking assignments *pro tanto* of the mortgage, or a declaration of trust from Mehlhorn, and had they caused such instrument to be recorded, they would have followed the statute, and would thus have given notice to all the world of their rights, and would have prevented Mehlhorn from wronging any diligent person.

It seems thus self-evident that one who purchases a mortgage note without taking any assignment of the mortgage or other writing of his interest and placing the same of record, by his conduct demonstrates that he has placed his trust and confidence in the mortgagee to do or suffer nothing which will affect his undisclosed equitable interest. Mehlhorn very clearly and deliberately wronged someone, and it seems to us that he wronged those who trusted him first and further. Under the doctrine of comparative innocence, we see no escape from this conclusion.

This view is well supported by our previous decisions: *Seattle National Bank v. Ally,* 66 Wash. 610, 120 Pac. 94; *Erickson v. Kendall,* 112 Wash. 26, 191 Pac. 842; *Cadwallader v. Sprengle,* 131 Wash. 16, 228 Pac. 834; *Price v. Northern Bond & Mortgage Co.,* 161 Wash. 690, 297 Pac. 786; *Northern Bond & Mortgage Co. v. Cowell,* 172 Wash. 217, 20 P. (2d) 11. See, also, *Gottstein v. Harrington,* 25 Wash. 508, 65 Pac. 753, and *Christenson v. Raggio,* 47 Wash. 468, 92 Pac. 348. The *Erickson* case, the *Cadwallader* case and the *Price* case are especially apt, and very clearly support our present views upon all points.

Appellants cite, discuss, and seem to find something upon which to rely in the following cases: *Berger v. Baist,* 165 Wash. 590, 6 P. (2d) 412; *Kiley v. Bugge,* 165 Wash. 677, 5 P. (2d) 1038; *Koppler v. Bugge,* 168 Wash. 182, 11 P. (2d) 236; *Liska v. Beckmann,* 168 Wash. 489, 12 P. (2d) 599; *Palm v. Brydges,* 169 Wash. 28, 13 P. (2d) 57; *Ross v. Johnson,* 171 Wash. 658, 19 P. (2d) 101. We have re-examined all of these cases, and find much in them which supports our present conclusions. If there be anything said in any one which seems to be out of harmony with what is here said, a careful comparison of the facts there disclosed with the facts in this case will dispel that idea and bring conviction that, then and now, we have applied the rule of comparative innocence according to the facts of the particular case in order to do equity so far as is possible.

The judgment of the trial court is affirmed.

BEALS, C. J., MAIN, STEINERT, and BLAKE, JJ., concur.